UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JOHN A. HAWKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Cause No. 3:18-CV-774-PPS-MGG |
| ROBERT E. CARTER, JR. *et al*, | ) |
| | ) |
| | ) |
| Defendant. | |

### OPINION AND ORDER

John A. Hawkins filed this action under 42 U.S.C. § 1983 alleging Fourth, Eighth, and Fourteenth Amendment violations and seeking declaratory, injunctive, and monetary relief while he was imprisoned at the Indiana State Prison (ISP). Hawkins named multiple defendants: Captain Bootz, Lieutenant Wilson, Officer Lumley, Officer Meiss, Officer Hubbard, and Officer Reid.[1] He also named Robert E. Carter, Jr., the Commissioner of the Indiana Department of Corrections (IDOC), and Ron Neal, Warden of ISP. Hawkins claims defendants violated his constitutional rights by being deliberately indifferent to (1) his safety regarding two altercations with other inmates, and (2) to his medical needs after the second altercation. [DE 1 at ¶¶ 1-3, 43-44.] He also brings state law claims against the defendants, including negligence, intentional infliction of emotional distress, and a theory of *respondeat superior*. *Id.* at ¶¶ 45-63. This matter is before me on Defendants' Motion for Summary Judgment. [DE 57.]

---

[1] While sued as Officers "Lumbly," "Messing," and "Reed," I will refer to them by the correct spelling of their names as indicated above.

## Background

On May 22, 2017, Hawkins was outside of his cell just before "chow time" when he was approached by inmate Joseph Whittington. [DE 57-1 at 58-59.] Whittington, who was also released from his cell early for chow time, mistakenly believed Hawkins had previously assaulted him in the recreation area. [DE 60-5.] As it turned out, Whittington had the wrong guy; Hawkins was not the person who had assaulted him. In any event, seeking revenge, Whittington muttered he was on a "kamikaze mission" and threatened Hawkins with a knife. [DE 1 at ¶ 19; DE 57-1 at 62.] Hawkins, self-admittedly intoxicated at the time, attempted to confiscate the knife. [DE 57-1 at 61-69.] Whittington stabbed Hawkins multiple times, puncturing Hawkins's lung. *Id.* at 72. Two other inmates intervened, restraining Whittington. [DE 57-2 at 13.]

Four prison officials were working that area during the incident: Officers Lumley, Meiss, Hubbard, and Dunlap.[2] [DE 57-1 at 32, DE 57-2 at 14-15.] Officer Meiss became aware of the attack and alerted the other officers. *Id.* at 21. Officer Lumley was in the officer's station and called out alerts over the intercom. *Id.* at 14-15. Officers Lumley and Hubbard were responsible for making sure the path to the incident was clear for the response team. *Id.* at 21-22. Officers Meiss and Hubbard responded to the scene. *Id.* at 15-16; [DE 57-3.] Upon arriving, Officer Hubbard ordered Whittington to give him the knife. *Id.* Whittington threw the knife to Officer Hubbard, fled, and was captured. *Id.*; [DE 57-2 at 16.] Officer Meiss escorted Hawkins to Captain Wardlow to

---

[2] Officer Dunlap is not a defendant in this case.

photograph Hawkins's injuries and then took him to the medical unit. [DE 57-2 at 16.] Hawkins was subsequently treated at a nearby hospital. [DE 1 at ¶ 21; DE 57-1 at 77.]

When Hawkins returned from the hospital, he went into lockdown for about a month and he fully recovered. [DE 57-1 at 78.] Hawkins filed an Offender Complaint with the Warden and Commissioner for "failure to implement reasonable measures to preserve and protect inmate safety." [DE 1 at ¶ 22.] Hawkins alleged that Whittington was not authorized to be near Hawkins's cell at the time of the incident. [DE 59 at 3.] Officer Meiss stated that during chow time, the four officials on duty have "very little control over where each inmate goes." [DE 57-2 at 14.] The outcome from the internal complaint is unclear from the record.

On July 9, 2017, a few days after leaving lockdown, the second incident occurred. [DE 1 at ¶ 23.] Hawkins went to the recreational area during chow time. [DE 57-1 at 80.] When he arrived, multiple inmates from another cell block were fighting. *Id.* at 82. Hawkins did not know any of the fighting inmates. *Id.* at 83. Hawkins took it upon himself to intervene in the attack and one inmate struck him in the head with a steel horseshoe while another inmate stabbed him multiple times. *Id.* at 83-86. Hawkins was taken to a local hospital to treat his injuries. *Id.* at 15. Hawkins claims the injuries from the horseshoe have led to speech impediments, seizures, and decreased range of motion. *Id.* at 92-94. Upon his return from the hospital, Hawkins was confined to administrative segregation for three days, as directed by Captain Wardlow,[3] Captain

---

[3] Captain Wardlow is not a defendant in this case.

Bootz, and Lieutenant Wilson. *Id.* at 35-36. Administrative segregation confines an inmate to his cell for 23 hours a day. *Id.* at 36. Once during those three days, Hawkins was taken to the nurse. *Id.* at 37. On July 14, 2017, Hawkins was transferred to Miami Correctional Facility for medical care. *Id.* at 15-16.

Hawkins brought this lawsuit, claiming that the defendants demonstrated deliberate indifference to his safety by permitting repeated acts of prisoner-on-prisoner violence. [DE 1.] He alleges: (1) that the defendants failed to take reasonable measures to protect him during these two incidents and while in administrative segregation; and (2) that the defendants were deliberately indifferent to his serious medical condition in confining him to administrative segregation for three after the second incident. *Id.* at ¶¶ 20, 24, 32, 35, 38. He also sues Carter and Neal in their official capacities as IDOC Commissioner and ISP Warden for alleged policy and custom failures. *Id.* at ¶¶ 45-51. Lastly, he alleges state law theories of negligence and intentional infliction of emotional distress against all defendants, including Carter and Neal under a theory of *respondeat superior*. *Id.* at ¶¶ 52-63. Defendants moved for summary judgment on all claims. [DE 57.]

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, I must construe all facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Id.* at 255.

### A. Eighth Amendment Claims of Failure to Protect

Not every complaint by a prisoner regarding his health or safety rises to a constitutional violation under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Rather, prison officials may only be held individually liable under § 1983 when they are personally responsible for depriving an inmate of a constitutional right. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). The substantive legal test applied to each prison official is "deliberate indifference" under the Fourteenth Amendment. *Id* at 991-992.

A prison official is deliberately indifferent when he actually "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* A plaintiff may prove actual knowledge through direct or circumstantial evidence. *Id.* at 842-43. The official's conduct must be more than negligent; it must rise to the level of "deliberate or reckless in the criminal sense." *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990); *see Farmer*, 511 U.S. at 835.

Hawkins claims in Count 1 that prison officials were deliberately indifferent to the risks posed to him in both incidents. In other words, his claim is for failure to protect. It is certainly true that under the Eighth Amendment, correctional officials have a constitutional duty to protect inmates from violence. *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). But, "prisons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more." *Id*. (internal quotations and citation omitted). Therefore, a failure to protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005); *Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (general allegations of danger are not enough). Instead, Hawkins must establish "that the defendants had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendants['] failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010) (citation and quotation marks omitted); *see Farmer*, 511 U.S. at 843-44.

A plaintiff generally "proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (citation and quotation marks omitted) (holding that prison officials were on actual notice when the inmate complained of his cellmate's repeated threats to stab him and he was later stabbed by the cellmate). A plaintiff's complaint "that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the

official to whom the complaint was communicated had actual knowledge of the risk." *Id.* at 481. A plaintiff may also prove actual knowledge through circumstantial evidence. *See Balsewicz v. Pawlyk*, 963 F.3d 650, 656 (7th Cir. 2020) (finding that the evidence of ongoing threats by one inmate to another in front of a prison official put that official on notice of circumstances "indicating the danger of serious harm to [plaintiff] was not yet over and that [the official] drew such an inference."); *Schillinger v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020) (affirming a denial of summary judgment against three prison officials who learned of a threatening incident against the plaintiff and failed to take steps to protect him).

### 1. The May 22, 2017 Incident

In stating his § 1983 claim, Hawkins generally alleges that prison officials Bootz, Wilson, Lumley, Meiss, Hubbard, and Reid were deliberately indifferent to a known risk to his safety. However, Hawkins fails to identify which prison official had actual knowledge of the danger or serious risk that he faced. The closest he gets is asserting that four prison officials were working in the cellblock at the time inmate Whittington attacked him: Officers Lumley, Meiss, Hubbard, and Dunlap. [DE 57-1 at 32, 57-2 at 15-16.] There are no allegations in the record that Bootz, Wilson, or Reid had any involvement in this incident. Additionally, Dunlap is not a defendant in this case. Therefore, none of these officials will be considered in the analysis of this incident.

That leaves Officers Lumley, Meiss, and Hubbard. From the facts at hand, Hawkins fails to show that any of the officers had actual knowledge of the risk that

-7-

Whittington would attack Hawkins. Hawkins suggests that prison officials released Whittington from his cell early and without authorization. However, he provides no direct or circumstantial evidence about which officer released Whittington from his cell or that Officers Lumley, Meiss, or Hubbard had any actual knowledge of the risk towards Hawkins. In other words, no evidence in the record points to any of the officers being cognizant of any risk that Whittington might attack Hawkins.

Instead, the evidence shows that at the time of the incident, Officer Lumley was in the officer's station. [DE 57-2 at 14-15.] When Officer Meiss became aware of the attack, he and Officer Hubbard responded to the scene and intervened. *Id.* at 21; [DE 57-3.] Officer Hubbard ordered Whittington to relinquish the knife and Whittington complied. *Id.* After the incident, Officer Meiss had Hawkins's injuries photographed, escorted him to the medical unit, and Hawkins was treated at the hospital. [DE 57-2 at 16; DE 57-1 at 77.] There is no evidence from these facts that Officers Lumley, Meiss, or Hubbard had any actual knowledge of a risk that Whittington might attack Hawkins.

Hawkins then argues that the officials should have been aware of the risk, because of the likelihood Whittington may become violent. [DE 60 at 3.] Hawkins cites multiple cases where the attacking inmate had a known propensity for violence. *See Pierson v. Hartley,* 391 F.3d 898 (7th Cir. 2004), *Brown*, 398 F.3d at 913. However, Hawkins fails to provide evidence that Whittington had a known propensity for violence. In fact, Officer Meiss specifically testified that Whittington had not shown any aggressive tendencies around him, but instead was friendly, engaging him in

conversations. [DE 57-2 at 17, 20.] Officer Meiss seemed surprised that Whittington was the attacker. *Id.* at 17. He described Whittington as "typically very talkative" and "he never before gave any indication of really any type of aggression towards anybody . . .." *Id.* at 17, 20.

Hawkins had no known prior interactions with Whittington. In fact, Whittington admitted that he mistook Hawkins as another inmate who had previously attacked him in the recreational area. [DE 60-5.] Upon seeing Hawkins, and believing him to be the other inmate, Whittington brandished his knife, Hawkins attempted to confiscate the knife, and Whittington stabbed Hawkins. *Id.* Prisons are dangerous places. And isolated ad hoc attacks by one inmate on another, while scary and troubling, simply do not rise to the level of a constitutional violation. *Klebanowski*, 540 F.3d at 640.

In sum, no inference can be made from the circumstantial evidence that Officers Lumley, Meiss, or Hubbard had any actual knowledge that Whittington posed a safety risk to Hawkins. "Without specific reason to know of a danger" posed to Hawkins, "the defendants cannot be charged with being 'deliberately indifferent' – with 'consciously disregarding' a threat – to his safety." *Santiago*, 894 F.2d at 222. In other words, there is nothing about the assault on Hawkins that would permit a reasonable jury to conclude that the officers knew of and disregarded a risk to his safety. *Farmer*, 511 U.S. at 837. Therefore, the claim related to the assault on May 22, 2017 will be dismissed.

**2. The July 9, 2017 Incident**

As to the second incident, Hawkins claims that prison officials were deliberately indifferent towards his safety when Hawkins himself chose to intervene in a fight in the recreational area. Hawkins accuses Bootz, Wilson, Lumley, Meiss, Hubbard, and Reid of knowingly allowing violent inmates in the recreational area and failing to take reasonable steps to protect him. Again, I consider whether any prison official had actual knowledge of a risk to Hawkins, through direct or circumstantial evidence, and that the official failed to take reasonable steps in the face of that risk. *Farmer,* 511 U.S. at 843-44.

Hawkins's argument fails for multiple reasons. First, there is no evidence that a specific defendant had actual knowledge of a risk to Hawkins. No allegations place any of the defendants at the scene. Hawkins does not point to any evidence in the record that any of the defendants were working or supervising the area on July 9, 2017. Additionally, he does not point to any alleged action or inaction. Even if he did, it would be too far reaching to make the connection between Hawkins's actions and any "actual knowledge" by a prison official. Hawkins voluntarily chose to try and break up the fight himself. How could the prison officials have reasonably known that Hawkins was going to insert himself into a fight between inmates he did not know? There is simply no evidence that any prison official actually knew of a serious danger to Hawkins. *Compare Klebanowski,* 540 F.3d at 639-40 *with Schillinger v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020) (affirming a district court's order allowing an Eighth Amendment claim to survive dismissal on a failure-to-protect claim because the plaintiff alleged the officials learned of a threat against him and failed to take reasonable steps to protect

-10-

him.) And the fact that the inmates in the altercation were gang members is too general of an allegation to rise to the level of deliberate indifference. *See Brown*, 398 F.3d at 913.

Even taking the evidence in the light most favorable to Hawkins, nothing in the record shows that any defendant was aware of specific circumstances that Hawkins's safety was at risk. The mere fact that inmates from another cellblock were in the recreational area is insufficient to allow for an inference that a substantial harm towards Hawkins existed and that prison officials disregarded that risk. And without evidence that any defendant knew of the danger, Hawkins's claim of deliberate indifference fails.

Hawkins also argues that the defendants were deliberately indifferent to him by providing access to steel horseshoes in the recreational area. [DE 1 at 7; DE 60 at 5.] First, he claims that a question of material fact exists as to "the availability of less dangerous composite horseshoes." [DE 60 at 5.] He also points out that the prison replaced the steel horseshoes with composite horseshoes after this incident. *Id.* at 10. While evidence of subsequent remedial measures may be admissible to prove the feasibility of precautionary measures, it is not admissible to prove culpable conduct or negligence. FED. R. EVID. 407. Indeed, a party may take steps to alleviate an alleged defect without fear of that action being used against them at trial. *Id.* The fact that steel horseshoes were subsequently replaced with composite horseshoes cannot be admitted to prove liability on behalf of Defendants.

Additionally, changing out the steel horseshoes for composite horseshoes does not rise to the level of deliberate indifference by the Defendants. Prison officials cannot

predict which objects will be used as weapons against other inmates. Inmates have access to numerous objects which could be used as potential weapons. But it is too far a stretch to require prison officials to be aware of every possible risk that could occur within a prison. At most, Hawkins alleges general claims of negligence, which do not rise to the level of deliberate indifference. *Santiago*, 894 F.2d at 221.

In sum, Hawkins fails to allege actual knowledge by any defendant and a conscious disregard to his safety; therefore, he fails to allege a claim of deliberate indifference. *Id.* at 222; *see Farmer*, 511 U.S. at 837. The claim related to the assault on July 9, 2017 will therefore be dismissed.

### B. Claims Relating to Placement in Administrative Segregation

Hawkins also argues that prison officials were deliberately indifferent to his safety and health when they placed him in administrative segregation after the second incident. Prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's safety or serious medical needs. *Estelle*, 429 U.S. at 104. Upon release from the hospital in the second incident, Hawkins generally alleges that Bootz, Wilson, Lumley, Meiss, Hubbard, and Reid unilaterally disregarded a medical personnel's orders and placed him in administrative segregation, exposing him to harm by other inmates and preventing him from medical care. [DE 1 at ¶¶ 31-33, 39.]  But he

only identifies Captain Wardlow,[4] Lieutenant Wilson,[5] and Captain Bootz. [DE 57-1 at 34-35.] He provides no evidence that Officers Lumley, Meiss, Hubbard, or Reid were involved. Therefore, Hawkins fails to allege a proper claim against Lumley, Meiss, Hubbard, or Reid regarding this incident and they will not be considered in this analysis.

Now that this claim is properly narrowed to Lieutenant Wilson and Captain Bootz, I proceed with evaluating whether there is a genuine issue of material fact for this claim to survive past summary judgment. Hawkins claims that he suffered mental and emotional anguish and was in fear of attack by other inmates while in administrative segregation. However, this is a non-starter for multiple reasons. First, Hawkins conceded during his deposition that he was not attacked by anyone during the three days he was in administrative segregation. [DE 57-1 at 35.] So, there is no evidence that Hawkins suffered any injury while in administrative segregation. *Id.* at 35-46.

Also, pursuant to 42 U.S.C. § 1997e(e), prisoners cannot claim emotional damages that are not preceded by actual injury. Hawkins must prove a physical injury to recover compensatory damages for emotional and mental harm. *Calhoun v. Detella,* 319 F.3d 936, 940 (7th Cir. 2003); *see also Byrd v. Hobart*, 761 F. App'x 621, 623 (7th Cir.

---

[4] Captain Wardlow is not a defendant in this case.
[5] In their Motion for Summary Judgment, Defendants argue that Hawkins sued Officer Wilson, not Lieutenant Wilson, and therefore Lieutenant Wilson is not a named Defendant. [DE 57 at 5.] However, Hawkins clearly names "Lieutenant Wilson" in the Complaint, so this argument by Defendants is a non-starter. [DE 1.]

2019). Here, Hawkins fails to demonstrate a cognizable physical harm during his three days in administrative segregation. Indeed, he conceded in his deposition that, although he was afraid of attacks by other inmates, no attacks occurred. [DE 57-1 at 36.] Nor did he point to any deterioration of his medical condition during that time. In other words, Hawkins makes no claim of an actual harm that befell him because of being placed in administrative segregation during those three days. Therefore, under 42 U.S.C. § 1997e(e), Hawkins's claim for mental and emotional anguish fails.

However, I will still consider Hawkins's claims regarding whether Wilson and Bootz were deliberately indifferent towards his serious medical needs. In order to succeed past summary judgment, Hawkins must show both (1) that "his condition was objectively, sufficiently serious" and (2) "that the prison officials manifested deliberate indifference to his serious medical needs." *Holdreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). It's plain from all the evidence that Hawkins's medical condition was objectively serious. Hawkins's condition immediately after the assault, his treatment at the hospital, and his condition upon return from the hospital meets several examples of a serious medical need. Hawkins suffered multiple stab wounds and injuries from being hit with a steel horseshoe. When he returned from the hospital on July 11, his injuries included paralysis on the right side of his body, an inability to speak, staples in his head, and seizures. These allegations meet the objective showing that Hawkins had a serious medical condition.

The next issue is whether Wilson or Bootz actually knew that a harm to Hawkins's federally protected right was substantially likely and whether they disregarded the known risk. *Hildreth*, 960 F.3d at 431; *Farmer*, 511 U.S. at 837. An accused official will not be held liable if he proves that he was "unaware of even an obvious risk to inmate health or safety." *Petties*, 836 F.3d at 728 (citing *Farmer*, 511 U.S. at 844). According to the record, on July 11th, Hawkins returned from the hospital after intervening in an altercation between other inmates, in which he sustained multiple stab wounds and was hit with a steel horseshoe. [DE 57-1 at 91-92.] His injuries included paralysis on the right side of his body and the inability to speak. [DE 57-1 at 35.] He also had staples in his head and suffered from seizures. *Id.* at 18, 37, 91. Hawkins recalls a conversation where medical personnel told Captain Wardlow and Lieutenant Wilson to place him in G dorm to heal. *Id.* at 34. Instead, the officers placed him in administrative segregation for three days. As discussed above, Hawkins feared attack, but no attacks occurred. *Id.* While not evaluated daily, Hawkins was taken to the nurse once during those three days. *Id.* at 36. On July 14, 2017, Hawkins was transferred to Miami Correctional Facility. *Id.*

Hawkins claims that Wilson and Bootz were deliberately indifferent by putting him in administrative segregation instead of G dorm, as suggested by the medical personnel. [DE 57-1 at 34.] Specifically, he wanted medical staff to evaluate the staples in his head daily. *Id.* at 37. Hawkins also states he was unable to communicate because of problems with his speech. *Id.* at 3. However, nothing in the record suggests that

-15-

placement in G dorm would have provided him medical services above that in administrative segregation. He was, in fact, taken to the nurse once during those three days. *Id.* at 36. Hawkins provides no evidence that his medical condition deteriorated or that he had any additional medical issues over that time. Nothing in the record indicates that the medical treatment Hawkins would have received in G dorm would have been better than what he received in administrative segregation.

Accordingly, I find that Hawkins's claim alleging Wilson or Bootz were deliberately indifferent in placing him in administrative segregation for three days fails. No reasonable jury could conclude that while detained in administrative segregation, Wilson or Bootz actually knew of a substantially likely harm to Hawkins's medical health or safety and then disregarded the known risk. For these reasons, Hawkins's claims do not survive summary judgment.

### C. *Monell* Claims

Hawkins next claims that the Warden and Commissioner are liable for the prison's unconstitutional policies and customs, specifically that they failed to exercise reasonable care in the hiring, training and supervision of the prison officials, such that the officials believed their actions would not be properly monitored and misconduct would be tolerated. [DE 1 at ¶¶ 45-51.] Under *Monell*, "§ 1983 provides a remedy against a municipality for its *own* constitutional torts but not those of its employees or agents; the statute doesn't authorize vicarious liability under the common-law doctrine of *respondeat superior.*" *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 383 (7th Cir. 2017)

(emphasis in original) (referencing *Monell v. NYC Soc. Serv.*, 436 U.S. 658, 691-92 (1978) *reaffirmed in L.A. County v. Humphries*, 562 U.S. 29 (2010)). Additionally, *Monell* claims are reserved for municipalities and other governmental bodies that are not arms of the state. *Monell*, 436 U.S. at 691 n.54; *Billman v. Ind. Dept. of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995). Unfortunately for Hawkins, state prisons are arms of the state and the state enjoys immunity from suit for damages. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). He may only proceed on this claim if it falls under an exception: Congress has abrogated the state's immunity, the state waived its own immunity, or the remedy is prospective equitable relief for an ongoing constitutional violation. *Id.* at 99-103; *See Joseph v. Bd. Of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748 (7th Cir. 2005). None of the exceptions apply here. Congress did not abrogate Indiana's immunity through Section 1983, Indiana has not consented to this lawsuit, and there is no ongoing constitutional violation since Hawkins has been transferred to Miami Correctional Facility.

Hawkins also maintains that the Commissioner and Warden are liable under a theory of vicarious liability for inaction regarding the alleged misconduct of their employees. He specifically focuses on the policy and/or custom of failing "to exercise reasonable care in hiring, training and supervision" and monitor prison officials. [DE 1 at ¶¶ 46-51.] But as noted above, this argument fails for the simple fact that § 1983 does not allow for claims of vicarious liability against governmental entities. *Glisson*, 849 F.3d at 383; *Giles v. Godinez*, 914 F.3d 1040, 1054 (7th Cir. 2019). Therefore, Hawkins's § 1983

claims against the Commissioner of the IDOC and Warden of ISP in Count 2 do not survive summary judgment.

### D. State Law Claims

The final issue is what to do with the state law claims. District courts have discretion to decline exercising supplemental jurisdiction that they otherwise possess. 28 U.S.C. § 1367(c). One instance in which that may occur is when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In deciding whether to retain the case, a district court considers and weighs the "values of judicial economy, convenience, fairness, and comity." *Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008). Because the federal claims are being dismissed, the court will decline to exercise supplemental jurisdiction over the state law claims. These claims will be dismissed without prejudice and Hawkins may bring them, if he chooses, in state court.

### Conclusion

For these reasons, Defendants' Motion for Summary Judgment [DE 57] is **GRANTED.** All federal claims are **DISMISSED WITH PREJUDICE** against Defendants. The remaining state court claims are **DISMISSED WITHOUT PREJUDICE**. The Clerk is directed to close this case.

SO ORDERED on June 15, 2021.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT